***NOT FOR PUBLICATION*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| GEORGE LEVY,<br><br>        Plaintiff,<br><br>v.<br><br>AT&T SERVICES, INC.,<br><br>        Defendant. | Civil Action No. 21-11758 (FLW)<br><br>OPINION |

**WOLFSON, Chief Judge:**

George Levy ("Plaintiff") filed this suit against AT&T Services, Inc. ("Defendant") following his termination by Defendant, bringing age discrimination claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"), and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A 10:5-1, *et seq*. Presently before this Court is Defendant's Motion to Compel Arbitration and Stay Proceedings, arguing that Plaintiff's claims are subject to an enforceable arbitration agreement ("Arbitration Agreement"), to which that Plaintiff agreed during his employment with Defendant.[1] For the reasons set forth below, Defendant's Motion to Compel Arbitration is **GRANTED**, and a stay is issued as to Plaintiff's claims.

---

[1] On March 3, 2022, President Biden signed the "Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021," which renders unenforceable pre-dispute agreements that require employees to arbitrate sexual assault or sexual harassment claims. Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, Pub. L. No. 117-90, 136 Stat. 26. Because Plaintiff brings age discrimination claims, the Act does not apply to the present matter.

1

I.  **BACKGROUND AND PROCEDURAL HISTORY**

The relevant facts are derived from Plaintiff's Complaint and the parties' declarations. ECF Nos. 1 ("Complaint"), 6-2 ("Giordano Decl."), 6-3 ("Rooney-McMillen"), 9-2 ("Levy Decl."). Plaintiff, a New Jersey citizen, is a former employee of AT&T Services, Inc., and was hired by the company in November 1998. Compl. ¶¶ 1, 17-18. Prior to his termination on July 24, 2020, Plaintiff held the position of Lead Channel Manager, which primarily consisted of supporting AT&T's Public Sector division with federal, state, and local government and education market sensing, contract analysis, and customer experience assessments. Compl. ¶¶ 20-21, 46. AT&T is a corporate entity organized under the laws of Delaware, but is duly registered to transact business in the state of New Jersey and has several places of business located throughout the New Jersey. Compl. ¶ 3.

On December 3, 2011, AT&T sent an email to Plaintiff at his AT&T-issued email address with the subject line, "Action Required: Arbitration Agreement." Giordano Decl. ¶ 18, Exs. 1, 4. The body of the email stated:

> AT&T has created an alternative process for resolving disputes between the company and employees. Under this process, employees and the company would use independent, third-party arbitration rather than courts or juries to resolve legal disputes. Arbitration is more informal than a lawsuit in court, and may be faster. The decision on whether or not to participate is yours to make. To help you make your decision, **it is very important for you to review the Management Arbitration Agreement linked to this email**. It provides important information on the process and the types of disputes that are covered by the Agreement. Again, the decision is entirely up to you. To give you time to consider your decision, the company has established a deadline of no later than 11:59 PM Central Standard Time on Monday, Feb. 6, 2012 to opt out -- that is, decline to participate in the arbitration process -- using the instructions below. If you do not opt out by the deadline, you are agreeing to the arbitration process as set forth in the Agreement. This means that you and AT&T are giving up the right to a court or jury trial on claims covered by the Agreement.

*Id*. Ex. 1.  The email then, in bold lettering, instructed Levy to click an electronic link at the bottom of the email to reach the Agreement, which contained instructions on opting out of the Agreement. *Id*. Exs. 1, 2.  The Agreement also stated that it is "governed by the Federal Arbitration Act" and "applies to any claim" that a party may have against "(1) any AT&T company, (2) its present or former officers, directors, employees or agents . . ., [and] (3) [AT&T's] parent, subsidiary, and affiliated entities[.]" *Id*. Ex. 2.  Further, the Agreement lists the claims covered by the Agreement, which "include[s] without limitation those arising out of or related to [Plaintiff's] employment or termination of employment with [AT&T] and any other disputes regarding the employment relationship[.]" *Id*.  The Agreement goes on to explain which other claims are and are not covered by the Agreement, and the details of the arbitration process, including how to commence arbitration, cost distribution among the parties, conduct of arbitration proceedings, and issuing of arbitration awards, among other things.  *Id*.

Plaintiff did not respond to AT&T's initial email, and as such, Levy received two follow-up emails, identical in substance to the original email, on December 15, 2011, and January 16, 2012.  *Id*. ¶ 26, Ex. 4.  According to AT&T records, Levy accessed the Arbitration Agreement at 8:22 AM on January 12, 2012, which required Plaintiff to authenticate his identity with his AT&T username and password.  *Id*. ¶ 20 Exs. 3, 5.[2]  Ultimately, Levy did not complete the opt out procedure by February 6, 2012.  *Id*. ¶¶ 25-26.

Plaintiff filed this action on May 26, 2021, alleging violations of the ADEA and the NJLAD. ECF No. 1.  On August 6, 2021, Defendant filed the present Motion to Compel Arbitration and Stay Proceedings, arguing that Plaintiff consented to the Arbitration Agreement

---

[2] Plaintiff states in his declaration that he has no recollection of receiving or reviewing any emails or documents from AT&T regarding the Arbitration Agreement.  Levy Decl. ¶¶ 4-8.

3

by failing to follow the opt out procedures, and that therefore, this matter must be sent to arbitration. ECF No. 6. ("Mot. to Comp.").

## II. LEGAL STANDARD

The FAA establishes "a strong federal policy in favor of the resolution of disputes through arbitration." *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 219 (3d Cir. 2014) (quoting *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 522 (3d Cir. 2009)). Congress passed the FAA specifically "'to reverse the longstanding judicial hostility to arbitration agreements . . ., and to place arbitration agreements upon the same footing as other contracts.'" *Teamsters Local 177 v. United Parcel Service*, 966 F.3d 245, 251 (3d Cir. 2020) (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002)).

In achieving this end, the FAA provides that a contract containing an arbitration clause "shall be binding, allows for the stay of federal court proceedings in any matter referable to arbitration, and permits both federal and state courts to compel arbitration if one party has failed to comply with an agreement to arbitrate." *Beery v. Quest Diagnostics, Inc.*, 953 F. Supp. 2d 531, 537 (D.N.J. 2013) (citing 9 U.S.C. §§ 2-4). Collectively, "those provisions [of the FAA] 'manifest a liberal policy favoring arbitration agreements.'" *Id.* (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). In that vein, "'as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Id.* (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).

New Jersey state law accords with the federal preference for arbitration. The Supreme Court of New Jersey has explained that "the affirmative policy of [New Jersey], both legislative and judicial, favors arbitration as a mechanism of resolving disputes." *Martindale v. Sandvik, Inc.,* 173 N.J. 76, 92 (2002); *see also Curtis v. Cellco Partnership,* 413 N.J. Super. 26, 34 (App.

Div. 2010) ("New Jersey courts favor arbitration as a means of resolving disputes, embracing the federal policy preferring this method of alternative dispute resolution.").

Although federal and state law presumptively favor the enforcement of arbitration agreements, when a district court is presented with a motion to compel arbitration, it typically answers the following two questions before compelling arbitration pursuant to § 4 of the FAA: (1) whether the parties entered into a valid arbitration agreement; and (2) whether the dispute at issue falls within the scope of the arbitration agreement. *Century Indem Co.*, 584 F.3d at 523.

When performing this inquiry, courts apply "ordinary state-law principles that govern the formation of contracts," *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (quotations and citation omitted), and when "determining whether [a] particular dispute falls within a valid arbitration agreement's scope, 'there is a presumption of arbitrability[:] an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Century Indem. Co.*, 584 F.3d at 524 (quoting *AT & T Techs. v. Commc'ns. Workers of Am.*, 475 U.S. 643, 650 (1986)).

## III. DISCUSSION

Plaintiff does not dispute that AT&T offered the Agreement in a valid manner, or that the Agreement's terms provided sufficient consideration. Nor does Plaintiff dispute that, should the Agreement found to be validly entered, his claims fall within the Agreement's scope. Rather, Plaintiff's sole argument is that his failure to complete the opt-out form did not manifest an unmistakable intention, and thereby his assent, to enter into the Arbitration Agreement, and thus, he is not subject to its terms.

More specifically, Plaintiff argues that inaction is insufficient to assent to an arbitration agreement, since, in Plaintiff's view, the "overwhelming weight" of New Jersey case law requires enforcement of arbitration agreements "only where there is some *additional* manifestation of assent accompanying the failure to opt-out[.]" Pl. Opp. Br. at 5. In that connection, Plaintiff explains that because he neither signed or submitted any electronic acknowledgment that he had reviewed or understood the Agreement, nor affirmatively clicked "yes" on a webpage indicating that he intended to enter the Agreement, he never actually assented to the Agreement. *Id*. at 9. Defendant disagrees, and maintains that requiring "additional" action would, in contravention to the FAA and New Jersey law, place arbitration agreements on unequal footing with other contracts, because, according to Defendant, so long as the offeree receives notice of an offer's terms, New Jersey courts have long recognized that silence or inaction is a valid manner of acceptance. Def. Reply Br. at 7, 10. As such, Defendant contends that Plaintiff received adequate notice of the Agreement via email, reviewed the terms of the Agreement, and that Plaintiff's failure to opt out constituted assent. Under the circumstances attendant here, I find that there was an enforceable agreement to arbitrate.

Under New Jersey law, "[a]n agreement to arbitrate, like any other contract, must be the product of mutual assent, as determined under customary principles of contract law." *James v. Glob. TelLink Corp.*, 852 F.3d 262, 265 (3d Cir. 2017) (quoting *Atalese v. U.S. Legal Servs. Grp., L.P.*, 219 N.J. 430, 442 (2014)). Therefore, "if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." *Crawford v. Compass Grp. USA*, No. 14-2545, 2015 WL 1006389, at *3 (D.N.J. Mar. 6, 2015) (citation omitted). To manifest assent, "an offeree must provide 'unqualified acceptance,' which can be express or implied by conduct." *James*, 852 F.3d at 265; *see Skuse v. Pfizer, Inc.*, 244 N.J. 30, 50

(2020) ("New Jersey contract law recognizes that in certain circumstances, conduct can constitute contractual assent"); Restatement (Second) of Contracts 30(1) (1981) ("An offer may invite or require acceptance to be made by an affirmative answer in words, or by performing or refraining from performing a specified act . . ."). Furthermore, "[i]f an offer prescribes the place, time or manner of acceptance[,] its terms in this respect must be complied with in order to create a contract." *Skuse*, 244 N.J. at 59 (quoting *Leodori v. CIGNA Corp.*, 175 N.J. 293, 306 (2003)).

Plaintiff's legal position that there must be an "additional" action for assent accompanying inaction to opt out is based on a misreading of the relevant case law. Plaintiff discusses a number of cases where an employee-offeree was required to sign an "acknowledgement form," or conduct some other affirmative act, signifying that he or she received an offer to arbitrate by the employer and that employee understands that he or she may opt out of the agreement by a certain date. *See, e.g.*, *Descafano v. BJ's Wholesale Club, Inc.*, No. 15-7883, 2016 WL 1718677 (D.N.J. Apr. 28, 2016) (finding that the plaintiff consented to contract when plaintiff signed "Acknowledgement of Receipt" form that informed the plaintiff of ability to opt out by certain date); *Jayasundera v. Macy's Logistics & Operations, Dep't of Human Res.*, No. 14-7455, 2015 WL 4623508 (D.N.J. Aug. 3, 2015) (finding plaintiff accepted terms of the arbitration agreement by signing acknowledgment form and failing to fill out opt out form by prescribed date); *Uddin v. Sears, Roebuck & Co.*, No. 13-6504, 2014 WL 1310292, at *2 (D.N.J. Mar. 31, 2014) (granting motion to compel arbitration where employee acknowledged receipt of arbitration agreement and failed to opt out). But none of these cases hold that an affirmative act, such as the signing of an acknowledgment form, is *required* for an offeree to validly assent to opt out, nor do they hold, as a general matter, that acceptance by refraining to perform an act, *i.e.*, inaction, is invalid. Rather, the affirmative acts in these cases are solely related to whether the employee was properly *notified*

of the arbitration agreement and that the employee would assent through inaction unless he or she filled out an opt out form.  Indeed, contrary to Plaintiff's position, these cases explicitly state that, so long as the employee is notified of the offer, failure to opt out of the arbitration through inaction was a proper method to assent.  *See Schmell v. Morgan Stanley & Co., Inc.*, No. 17-13080, 2018 WL 4961469, at *2 (D.N.J. Oct. 15, 2018) (finding that "Plaintiff had notice," and therefore, his "continued employment without opting out constituted assent to the Agreement[.]"); *Descafano*, 2016 WL 1718677, at *2 ("Once a party receives notice, acceptance of the arbitration program may be signified by failing to opt out."); *Jayasundera*, 2015 WL 4623508, at *4 ("Failure to opt out of an arbitration program after receiving notice is sufficient conduct to signify acceptance."); *see also Uddin*, 2014 WL 1310292 (granting motion to compel arbitration where employee was notified of the arbitration agreement and chose not to opt out of the agreement within the 30 day deadline).

Importantly, at least two courts in this circuit have found that AT&T employees assented to the terms of a substantively identical Arbitration Agreement where they received the same email notification as in this case, and neither court required completion of an "additional" affirmative act.  *See Horowitz v. AT&T Inc.*, No. 17-4827, 2019 WL 77331, at *9 (D.N.J Jan. 2, 2019) ("Plaintiffs accepted the terms of the Arbitration Agreement by receiving notice of the agreement, clicking on the link, and failing to opt out within the deadline."); *Stephenson v. AT&T Services, Inc.*, No. 21-0709, 2021 WL 3603322, at *6 (E.D. Pa. Aug. 13, 2021) ("Here, Plaintiff manifested his intent to be bound by the terms of the Arbitration Agreement by not opting out within the sixty-eight-day period between December 3, 2011 and February 6, 2012, after being given three notices to do so if he wished not to be bound.").  Nevertheless, Plaintiff argues that *AT&T Mobility Servs. LLC v. Jean-Baptiste*, another New Jersey district court case involving the same opt-out provision,

8

should govern. No. 17-11962, 2018 WL 3425734 (D.N.J. July 16, 2018). I disagree. The *Jean-Baptiste* court rejected AT&T's argument that a failure to opt out signified plaintiff's assent to the arbitration agreement, explaining that a New Jersey Supreme Court case, *Leodori v. CIGNA Corp.*, "compel[led]" the court to require an "explicit, affirmative agreement that unmistakably reflects" an intent to agree, such as clicking or signing an item that states, "I agree." *Id*. at *3 (quoting *Leodori*, 175 N.J. at 303). But this is a misapplication of *Leodori*. In *Leodori*, the offeror required a signature from an employee-offeree as the prescribed manner of assent to an arbitration agreement. *Leodori*, 175 N.J. at 305. The *Leodori* court noted that "when one party . . . presents a contract for signature to another party, the omission of that other party's signature is a significant factor" in determining whether there was mutual assent. *Id*. Because, critically, the plaintiff had not signed the arbitration agreement, the *Leodori* court stated that "[a]bsent plaintiff's signature here, we cannot enforce the waiver provision unless we find some other unmistakable indication that the employee affirmatively had agreed to arbitrate his claims." *Id*. at 307. *Leodori* is distinguishable from *Jean-Baptiste* and the present matter. Here, and in *Jean-Baptiste*, "[n]o form [which] intended to confirm the employee's assent was left unsigned," nor was there a document "designated by the employer to be the employee's expression of assent[.]" *Skuse*, 244 N.J. at 59. Instead, the prescribed manner of assent for both the *Jean-Baptiste* plaintiff and Plaintiff, here, was to refrain from opting out of the Agreement, which they both, indeed, did not perform. Because these plaintiffs followed the prescribed manner of assent, and therefore indicated their intent to be bound, the Court need not search for "some other unmistakable indication" of assent. For these reasons, I do not agree with *Jean-Baptiste*'s interpretation of *Leodori* or its conclusion. *See Horowitz*, 2019 WL 77331, at *9 (noting that *Jean-Baptiste* "imposes a more onerous test than intended by the New Jersey Supreme Court for establishing whether an arbitration agreement was

formed."); *Skuse*, 244 N.J. at 60-61 (finding that *Leodori* "differ[ed] fundamentally" because the *Skuse* arbitration agreement required assent through continued employment and did not require a signature to assent).

Furthermore, to the extent that Plaintiff argues he was not properly notified of the arbitration agreement, he is incorrect. AT&T sent Plaintiff emails about the Arbitration Agreement on December 3, 2011, December 15, 2011, and January 16, 2012. Giordano Decl. ¶ 18, Ex. 4. Notably, AT&T required Plaintiff to monitor emails received at his work email address and respond appropriately. ECF No. 6-3, Rooney-McMillan Decl. ¶ 7. The subject line of the email stated, "Action Required: Arbitration Agreement." Giordano Decl. Exs. 1, 4. The body of the email clearly explained the differences between arbitration and litigation, and then in bold text, stated that it was "very important for [Plaintiff] to review the Management Arbitration Agreement linked to this email." *Id*. The email then specified that the deadline for opting out was February 6, 2012, and that if Plaintiff did "not opt out by the deadline, [he was] agreeing to the arbitration process as set forth in the Agreement." *Id*. The email reiterated that this meant that "[Plaintiff] and AT&T [were] giving up the right to a court or jury trial on claims covered by the Agreement." *Id*. At the bottom, the email provided, in bold lettering, a link instructing Plaintiff to click in order to see the terms of the Agreement. *Id*. According to AT&T records, Plaintiff clicked that link on January 12, 2012, to review the Agreement, which required Plaintiff to authenticate his identity with his AT&T username and password. *Id*. ¶ 20, Ex. 3, 5. Following authentication, Plaintiff was taken to the Agreement, which clearly explained, among other things, the claims covered by the Agreement, which included those "arising out of or related to your employment or termination of employment[.]" *Id*. Ex. 2.

As an initial matter, Plaintiff clearly accessed the Agreement. In his declaration, Plaintiff states that he has no recollection of receiving or reviewing any emails or documents related to the Arbitration Agreement. Levy Decl. ¶¶ 4-8. But, importantly, Plaintiff does not dispute the evidence demonstrating his access to the online Agreement by logging in his username and password. As such, I find that Plaintiff did, in fact, receive proper notice of the Arbitration Agreement, even if Plaintiff did not ultimately review the Agreement. In *Skuse*, the New Jersey Supreme Court disagreed with the appellate court's decision that because employees receive large amounts of emails, the use of email to convey important information, such as an arbitration agreement, to an employee is an invalid form of delivering such an offer. *Skuse*, 244 N.J. at 53-54. The Supreme Court reasoned that even if the plaintiff claimed to have not reviewed the arbitration agreement email she received from her company due to the volume of emails sent to her, "her failure to review [those] communications would not invalidate the" agreement because as a general rule, the "onus was on plaintiff to obtain a copy of the contract in a timely manner to ascertain what rights it waived by beginning the arbitration process." *Id*. at 54. The Supreme Court went on to note that "no principle of New Jersey contract law bars enforcement of a contract because that contract was communicated by e-mail," and advised further that New Jersey "contract law recognizes that an electronic communication may be a clear and effective method of communicating proposed contract terms." *Id*. Essentially, in New Jersey, the fact that an email with the details of an arbitration agreement "appeared in Plaintiff's inbox, combined with the expectation that Plaintiff would read his email, is sufficient to indicate that Plaintiff had notice of the Agreement." *Schmell*, 2018 WL 4961469, at *2 (noting that the plaintiff's claim "that he never read the email" with the arbitration agreement and that he "could receive many, possibly hundreds, of emails in a single day" is "beside the point"). Because, here, Plaintiff received three emails

notifying him of the Agreement, was expected to review his email, and clicked on the link to review the Agreement, Plaintiff was properly notified. *See, e.g.*, *Rivera-Colon v. AT&T Mobility Puerto Rico, Inc.*, 913 F.3d 200 (1st Cir. 2019) (finding plaintiff assented to arbitration agreement following same manner of notification and acceptance as the present matter); *Uszak v. AT&T Mobility Servs. LLC*, 658 F. App'x 758 (6th Cir. 2016) (same); *Couch v. AT & T Servs., Inc.*, No. 13-2004, 2014 WL 7424093 (E.D.N.Y. Dec. 31, 2014) (same).

In light of the proper notification and Plaintiff's failure to opt out of the Agreement by the prescribed date in the notification emails, I find that he assented to the terms of the Arbitration Agreement. Because there are no other contract formation issues in dispute, and the claims clearly fall within the scope of the Arbitration Agreement as they are directly related to his termination, arbitration is compelled.

### IV.   CONCLUSION

For the reasons set forth above, Defendant's Motion to Compel Arbitration is **GRANTED**, and a stay is issued as to Plaintiff's claims. During the pendency of the arbitration proceedings, this matter is administratively terminated.

Date:   March 22, 2022                                      /s/ Freda L. Wolfson
                                                            Freda L. Wolfson
                                                            U.S. Chief District Judge